

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-16-00410-CR

NORVELL NORMAN                                    APPELLANT

V.

THE STATE OF TEXAS                                    STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 3 OF TARRANT COUNTY
TRIAL COURT NO. 1392759D

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Norvell Norman appeals his conviction for theft of service in an amount between $1,500 and $20,000. In one issue, Norman argues that the evidence is insufficient to support his conviction. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. BACKGROUND

Steve Howard testified at trial that he owned Bob's Automotive Repair shop located in Richland Hills, Texas. According to Howard, Bob's is a family-owned business that his father started in 1989. Howard said that he knew Norman both through his own prior dealings with him and through Norman's previous dealings with Howard's father, Bob. By Howard's account, in January 2013, Norman called the repair shop and reported that his vehicle, an Audi, had broken down and asked if Howard would send a tow truck to pick it up and bring it to the repair shop. After having the vehicle towed to his shop and after his mechanics examined it, Howard called Norman and gave him a verbal estimate of slightly more than $3,900 to fix the vehicle. Howard said that Norman authorized the repairs at that time.

After the repairs were finished, Howard called Norman and Norman came to the shop. Howard said that when Norman came into the shop on February 2, 2013, he went over the repairs with Norman, and Norman signed the repair bill, filled out a check that already had a signature on it, and presented it to him.

The State introduced a copy of the check, which was made out in the amount of $3,971.33. The account name on the check is Sheila Schuck, whom Howard believed to be Norman's wife. The State also introduced evidence that at the time Norman authorized the repairs, Schuck's account balance was $33.77, and that at the time Norman presented the check, the account balance was $4.45. Moreover, the State presented evidence that at no time during the

2

months of January, February, or March 2013 did Schuck's account balance contain sufficient funds to cover a check for $3,971.33. In fact, the State introduced evidence that except for two deposits totaling $320 made prior to January 17, 2013, no other deposits were made to the account before Norman presented the check. The checking account was also insufficient to cover a $760 check to a different payee which was returned for insufficient funds on February 4, 2013.[2] Finally, the State presented evidence that despite the fact that Schuck did not work outside the couple's home, an IRS refund check in the amount of $2,656.00 was deposited into her account on February 7, 2013, and $1,800 of cash was withdrawn that same day.

Howard averred that after he deposited the check, he received a notice from his bank stating that it had returned the check because the issuing bank had received a stop payment order. The State introduced evidence that the issuing bank charged Schuck's account a stop payment fee of $25 on February 4, 2013.

Howard said that after he learned of the stop payment order, he attempted to contact Norman by phone and then by registered mail unsuccessfully, so he contacted the Richland Hills Police Department and filed a complaint. Howard said that he never heard from Norman again and that his shop has never been compensated for the repair work performed on the Audi. He also testified that if

---

[2]The check that Norman presented to the repair shop is numbered 1074, and the $760 February 4, 2013 check is numbered 1073.

3

he had been notified that there was a problem with the repairs on the Audi, he would have immediately rectified the situation.

Sergeant Kirk Hamm of the Richland Hills Police Department testified that he spoke with Howard about the complaint. Hamm said that he later called Norman about it. According to Hamm, Norman initially told him that after he picked up the Audi from the repair shop, it broke down in Odessa, Texas, while he was driving to California. Norman also told Hamm that he had the vehicle towed to a repair shop in Odessa.

By Hamm's account, he then visited with Norman at Norman's residence in Saginaw, Texas, on February 6, 2013. Hamm said that the Audi was parked outside of Norman's residence when he arrived. Hamm averred that Norman told him that the Audi had been towed from Odessa to Saginaw, but despite having told Hamm that he had a receipt for the alleged towing, Norman was unable to produce one. Norman told Hamm that he couldn't find the receipt, and he believed it was boxed up because he and his girlfriend, Schuck, were moving to California. Hamm did say that Norman demonstrated to him that the vehicle would "turn over" but not start. Hamm stated that he also advised Norman to contact the repair shop to see if he and the repair shop could "get it worked out," but that Norman replied he wanted to get a second opinion.

Norman testified in his own defense. Norman stated that he and Schuck had been in an on-and-off relationship for nearly twelve years and that the

4

relationship—and where the couple chose to live—revolved around the couple's three children.

Norman said that the Audi belonged to Schuck but acknowledged that both his and her names were on the title. According to Norman, even though Schuck was the primary driver of the Audi, he had the vehicle towed to the repair shop and picked it up after Howard called him and informed him the repairs were complete. Norman said that the check he provided to Howard had been entirely filled in by Schuck and that she had told him to give it to Howard for the repairs.[3]

Norman stated that he had made up the story about the Audi having broken down in Odessa because he was scared about the ramifications of the stop payment order on the check. By Norman's account, he found out that the check had been stopped via voicemail when Howard called a few days after he picked up the vehicle. Norman said that he informed someone at the shop that the vehicle had broken down two days after he had picked it up. He further said that he never knew how much money was in Schuck's account and she did not tell him that she had stopped payment on the check. He averred that Schuck was no longer his girlfriend and that she was "[o]ne hundred percent" responsible for not having paid the shop for the repair work.

---

[3]During oral arguments before this court, Norman's attorney stated specifically and repeatedly that Schuck had signed the check and that Norman had filled out the remainder of the check once he arrived at the repair shop. A review of a copy of the check that was admitted at trial suggests that whoever filled in the majority of the check has a different style of penmanship than the person who signed it.

On cross-examination, Norman testified that he lived next door to "Bob Howard" who was the previous owner of the repair shop. He said that he knew Bob, Bob's wife, and Bob's children and that he had done business with Bob in the past. Specifically, Norman said that he had previously taken the Audi to the repair shop once and that he had taken other vehicles in for repair "[p]robably about four or five times."

Regarding his and Schuck's finances, Norman averred that the two kept their finances separate but that because Schuck did not work, he provided funds to her to take care of household bills. He also said that Schuck's parents paid for "a lot of things." Norman stated that he had never discussed whether Schuck's bank account had sufficient funds to cover the check he presented to Howard when he picked up the Audi.

Norman stated that he owned an "18-wheeler" that he drove and that he did not use the Audi. He also admitted to having prior convictions for theft in Texas and California. Norman further said that after he learned that Schuck had stopped payment on the check, he did not attempt to speak with anyone at the repair shop regarding the stopped check even though he had received voicemail messages concerning the matter.

The trial court found Norman guilty of theft of service in the amount of more than $1,500 but less than $20,000. The trial court sentenced Norman to two years in jail. This appeal followed.

### III. DISCUSSION

In one issue, Norman argues that the evidence is insufficient to support his conviction. Specifically, Norman argues that because a theft-of-service case requires proof that the deception must have induced the services and because he presented the check for the repairs after the repair work was performed, he cannot be guilty of theft of service in this case. *See generally Daugherty v. State*, 387 S.W.3d 654, 658 (Tex. Crim. App. 2013); *Gibson v. State*, 623 S.W.2d 324, 325 (Tex. Crim. App. [Panel Op.] 1980); *Cortez v. State*, 582 S.W.2d 119, 121 (Tex. Crim. App. [Panel Op.] 1979).

The State counters that Norman is improperly relying upon cases in which the charging instrument specifically alleged the passing of a post-services check as the deceptive act and that in this case the State did not allege that the check was the deceptive act; rather, the State alleged generally that Norman had secured performance of the repair services while intending to avoid payment and that the evidence of the check and the circumstances surrounding the check merely provided evidence that Norman's deceptive act of promising to pay for the repairs was done knowing that no payment would be made. We agree with the State.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential

7

elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime as defined by the hypothetically correct jury charge to the evidence adduced at trial. *See Jenkins*, 493 S.W.3d at 599; *Crabtree v. State*, 389 S.W.3d

8

820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599. Additionally, we must review circumstantial evidence of intent with the same scrutiny as other elements of an offense. *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014). Faced with a record that supports conflicting inferences of an appellant's intent, we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflict in favor of the prosecution, and must defer to that resolution." *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991).

9

**B. Theft of Service**

Section 31.04(a)(1) of the penal code provides: "A person commits theft of service if, with intent to avoid payment for service that the actor knows is provided only for compensation: . . . [he] intentionally or knowingly secures performance of the service by deception, threat, or false token." Tex. Penal Code Ann. § 31.04(a)(1) (West 2016). "Deception" is defined in section 31.01(1) of the penal code to mean "creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true." *Id.* § 31.01(1)(A) (West Supp. 2017).

In this case, viewing the evidence in a light most favorable to the trial court's verdict and drawing the reasonable inferences from that evidence, we conclude that the trial court could have reasonably found that because Schuck and Norman were in a long-term relationship that revolved around the couple's three children and because Norman was the sole income earner in the family, Norman was fully aware that neither he nor Schuck had the capability to pay for the repair services whenever Norman authorized them to be performed. This conclusion is buttressed by the evidence that at no time during the transaction did Schuck's account have sufficient funds to pay for the estimated repairs. Thus, the trial court was free to find that Norman had intentionally or knowingly secured the repair services with an intent to avoid payment for the repair services

10

that he knew would only be performed for roughly $3,900—the quote that Howard gave Norman prior to the services being performed.

The trial court could have further reasonably found that Norman's prior conduct of having brought the Audi into the repair shop and having paid for those repair services confirmed in Howard's mind the false impression of fact that Norman would pay for the services, thus affecting Howard's judgment in the repair-services transaction. *See Hargrave v. State*, No. 10-08-00158-CR, 2010 WL 486745, at *2 (Tex. App.—Waco, Feb. 10, 2010, pet ref'd) (mem. op., not designated for publication) ("[S]ecure in the thought that past services had been paid and that future performance would be also, Young then repaired the well by installing the new pump."). Moreover, the trial court was free to reasonably conclude that Norman's actions of lying to Hamm about when and where the Audi broke down and refusing to contact Howard to rectify or pay for the services demonstrated a consciousness that he had never intended to pay for the services and that he knew he had secured the performance of the repairs without ever intending to pay for them. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (noting that making false statements to cover up a crime is evidence indicating a consciousness of guilt and is admissible to prove the commission of the offense); *Comeaux v. State*, 413 S.W.3d 176, 187 (Tex. App.—Beaumont 2013) (holding that the jury is allowed to infer a consciousness of guilt when defendant lies to police), *aff'd*, 445 S.W.3d 745 (Tex. Crim. App. 2014); *Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1999,

pet. ref'd) (holding that defendant's changing story was evidence of a consciousness of guilt).

Norman argues that because he presented the check after the performance of the repair services, he cannot be guilty of theft of service in this case. Norman argues that *Daugherty*, *Gibson*, and *Cortez* all stand for the proposition that an insufficient or defective check presented after services have been provided is insufficient to sustain his conviction. *See Daugherty*, 387 S.W.3d at 658; *Gibson*, 623 S.W.2d at 325; *Cortez*, 582 S.W.2d at 121. But Norman's reliance on these cases is misplaced. As the State points out, in all three of the cases cited by Norman, the State specifically alleged in the charging instrument that the deceptive act was the passing of an insufficiently-funded check after the services had been performed. *See Daugherty*, 387 S.W.3d at 658; *Gibson*, 623 S.W.2d at 325; *Cortez*, 582 S.W.2d at 121. But in this case, the State did not allege that the deceptive act was the passing of the insufficient check; rather, the State alleged generally that Norman had procured the repair services by "deception, threat, or false token."

We hold that the trial court could have reasonably found that Norman, with an intent to avoid payment for the repair services that he knew were provided only for compensation, intentionally or knowingly secured the performance of the repair services by creating or confirming through his words and conduct a false impression in Howard's mind that likely affected Howard's judgment in the transaction, and that Norman never believed that he would pay for the services.

12

*See* Tex. Penal Code Ann. §§ 31.01(1)(A), 31.04(a)(1). Thus, we overrule Norman's sole issue.

## IV. Conclusion

Having overruled Norman's sole issue on appeal, we affirm the trial court's judgment.

/s/ Bill Meier

BILL MEIER
JUSTICE

PANEL: WALKER, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: February 1, 2018